**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOAO BOCK TRANSACTION SYSTEMS, LLC, | § § § | |
| Plaintiff, | § § § | CIVIL ACTION NO. 1:11-CV-06472 |
| v. | § § | |
| FIRST NATIONAL BANK, ET AL., | § § | |
| Defendants. | § § § | |

**DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

I. Introduction ........................................................................................................ 1

II. Factual Background ........................................................................................... 1

    A. The Patent-in-Suit ...................................................................................... 1

    B. Prosecution History of the Patent-in-Suit ................................................ 1

    C. Litigation Involving the Related '725 Patent ........................................... 2

III. Legal Standards ............................................................................................... 3

    A. Claim Construction .................................................................................... 3

    B. Indefiniteness ............................................................................................ 4

IV. Argument ......................................................................................................... 4

    A. "electronic money account" ....................................................................... 4

        1. The specification shows that an "electronic money account" is a specific type of account ................................................................. 5

        2. Defendants' construction of "electronic money account" is based on the plain meaning of the term ............................................ 7

        3. Plaintiff's construction would render the term "electronic money" meaningless ..................................................................... 8

        4. Plaintiff's construction is precluded under the doctrine of prosecution history estoppel ................................................... 9

    B. "one of ... and ..." ..................................................................................... 10

        1. Defendants' construction is supported by the plain, ordinary meaning of the claim terms based on the correct grammatical reading ................................................................... 10

        2. Defendants' construction is supported by the specification ................... 11

        3. Different terms in the same or related patents are presumed to have different meanings ......................................................... 12

    C. "one of a limitation and a restriction" ...................................................... 13

    D. "processor" ............................................................................................... 14

    E. "processing" / "processes" ....................................................................... 15

    F. "An [apparatus / method] for providing account security" ...................... 16

    G. "transaction" ............................................................................................ 18

    H. "receiver" ................................................................................................. 20

## TABLE OF CONTENTS
### (continued)

**Page**

I. "communication device" ........................................................................................... 22

J. "notification signal" ................................................................................................. 24

V. Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bicon, Inc. v. Straumann Co.*,
 441 F.3d 945 (Fed. Cir. 2006) .............................................................................................17

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*,
 224 F.3d 1308 (Fed. Cir. 2000) .....................................................................................9, 14

*Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801 (Fed. Cir. 2002) ............................17

*Civix-DDI, LLC v. Hotels.com, LP*,
 809 F. Supp. 2d 882 (N.D. Ill. 2011) ..................................................................................11

*Datamize, LLC v. Plumtree Software, Inc.*,
 417 F.3d 1342 (Fed. Cir. 2005) .............................................................................................4

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
 535 U.S. 722 (2002) ............................................................................................................10

*IGT v. Bally Gaming Int'l, Inc.*,
 659 F.3d 1109 (Fed. Cir. 2011) .............................................................................................3

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
 381 F.3d 1111 (Fed. Cir. 2004) ...................................................................................3, 4, 12

*Joao v. Sleepy Hollow Bank*,
 348 F. Supp. 2d 120 (S.D.N.Y. 2004) ..........................................2, 12, 13, 19, 21, 22, 23

*Joao Bock Transaction Sys., LLC v. Sleepy Hollow Bank*,
 445 Fed. Appx. 359 (Fed. Cir. 2011) .....................................................................................2

*Johnson & Johnston Assocs. v. R.E. Serv. Co.*,
 285 F.3d 1046 (Fed. Cir. 2002) (en banc) ...........................................................................12

*Markman v. Westview Instruments, Inc.*,
 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996) ........................................3

*Omega Eng'g, Inc., v. Raytek Corp.*,
 334 F.3d 1314 (Fed. Cir. 2003) ....................................................................................18, 21

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ......................................................................3, 19

## TABLE OF AUTHORITIES
### (continued)

<b>Page(s)</b>

*PureChoice, Inc. v. Honeywell Int'l, Inc.*,
   333 Fed. Appx. 544 (Fed. Cir. 2009) ..........................................................................4

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
   358 F.3d 870 (Fed. Cir. 2004) ...................................................................................11

*Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*,
   988 F.2d 1165 (Fed. Cir. 1993) ..................................................................................9

*z4 Techs., Inc. v. Microsoft Corp.*,
   507 F.3d 1340 (Fed. Cir. 2007) ...........................................................................18, 21

**STATUTES**

35 U.S.C. § 112 ...........................................................................................................4

## I. Introduction

Pursuant to L.P.R. 4.2, Defendants American Chartered Bank, Bridgeview Bank Group, Inland Bank & Trust, THE National Bank, Northbrook Bank & Trust Company, Hinsdale Bank & Trust Company, Lake Forest Bank & Trust Company, Northshore Community Bank & Trust Company, Inc., Libertyville Bank & Trust Company, Barrington Bank & Trust Company, N.A., First National Bank & Trust Company, and First American Bank (collectively "Defendants") respectfully submit this Opening Claim Construction Brief.

## II. Factual Background

### A. The Patent-in-Suit

U.S. Patent No. 6,047,270 (the "'270 Patent" or "patent-in-suit"), entitled *Apparatus and Method for Providing Account Security*, issued on April 4, 2000 to named inventors Raymond Joao ("Joao") and Robert Bock ("Bock"). *See* J.A. at 3 ['270 Patent, cover page]. In general, the '270 Patent claims an apparatus and method for providing account security for two types of accounts: (1) electronic money accounts (claims 1, 9, 19, 31, 45, and 47); and (2) brokerage accounts (claims 11, 18, 32, 44, 46, and 48). *Id.* ['270 Patent, Abstract]. In this litigation, Plaintiff alleges infringement of only the "electronic money account" claims of the '270 Patent. Specifically, Plaintiff is asserting independent claims 1, 9, 19, and 31, and dependent claims 3, 7, 24, 26, 51, 57, 67, 73, 83, and 85, against Defendants. A copy of the asserted claims, with the disputed terms highlighted, are included in Defendants' Appendix ("D.A.") at iii-vi.

### B. Prosecution History of the Patent-in-Suit

The '270 Patent issued from U.S. Patent Application No. 08/918,284 (the "'284 Application"), filed on August 25, 1997. *Id.* at 3 ['270 Patent, cover page]. Joao, a patent attorney, prosecuted the '284 Application on behalf of himself and Bock. *Id.* As originally filed, the '284 Application contained 20 claims. *Id.* at 212-16 ['284 Application].

The prosecution history contains two Office Actions, each of which rejected all of the pending claims as anticipated and/or obvious in view of U.S. Patent Nos. 5,615,110 ("Wong") and/or 5,708,422 ("Blonder"). *Id.* at 262-65 [Dec. 4, 1998 Office Action]; 298-300 [Apr. 27,

1999 Final Office Action].  After each Office Action, Joao cancelled all of the pending claims and added an entirely new set of claims.  *Id.* at 273-85 [Mar. 4, 1999 Amendment A]; 312-31 [July 1, 1999 Amendment B]; 348-50 [Aug. 9, 1999 Amendment C]; 355-78 [Sept. 4, 1999 Amendment D].  And, in each Response, Joao made non-specific arguments that the cited prior art did not disclose the various elements of the newly added claims.  *Id.* at 285-93; 333-43.

After the Final Office Action, Joao also amended the '284 Application to (for the first time) claim priority to other applications:  "This is a continuation-in-part application of U.S. Application Serial No. 09/169,053, filed October 9, 1998 [now U.S. Patent No. 6,529,725 (the "'725 Patent")], which is a continuation of U.S. Patent Application Serial No. 08/873,945, filed June 12, 1997, now U.S. Patent No. 5,878,337, which is a continuation application of U.S. Patent Application Serial No. 08/694,199, filed August 8, 1996."  *Id.* at 309; 312.  Joao implied that the claims were patentable over Blonder in view of the new claim of priority, despite the fact that Blonder was filed before the earliest of Joao's alleged priority applications.  *Id.* at 332-33.

On November 22, 1999, without further comment, the Examiner allowed claims 52-95 and 97-138 of the '284 Application, which were renumbered and issued as claims 1-86 of the '270 Patent.  *Id.* at 403-08 [Nov. 22, 1999 Notice of Allowability].

**C.     Litigation Involving the Related '725 Patent**

The related '725 Patent was asserted by Joao and Bock in a case captioned *Joao v. Sleepy Hollow Bank*, No. 03-cv-10199-CM-MDF (S.D.N.Y. filed Dec. 24, 2003).  As discussed below, other than being directed to different types of accounts (i.e., "electronic money accounts"), the asserted claims of the '270 Patent are similar to those construed (and found invalid) in *Sleepy Hollow*.  *See Joao v. Sleepy Hollow Bank*, 348 F. Supp. 2d 120 (S.D.N.Y. 2004); *Joao Bock Transaction Sys., LLC v. Sleepy Hollow Bank*, 445 Fed. Appx. 359 (Fed. Cir. 2011) (unpublished).  Because some of the same terms at issue here were construed by the court in *Sleepy Hollow*, those constructions are persuasive in the instant case.

### III.    Legal Standards

### A.    Claim Construction

"The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Claim construction is a question of law for the Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

During claim construction, "the words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question ... as of the effective date." *Phillips*, 415 F.3d at 1313.  The person of ordinary skill in the art is deemed to have read the patent claim term in the context of the entire patent, including the rest of the claims and the specification. *Id.*; *see also IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1117 (Fed. Cir. 2011) ("We caution that claim language must be construed in the context of the claim in which it appears.").

In addition to the claims and specification, a court should also consider the patent's prosecution history, if it is in evidence.  *Phillips*, 415 F.3d at 1317.  The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Id.* "Yet, because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

A court may also rely on extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (quoting *Markman*, 52 F.3d at 980).  "Extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319.

**B.      Indefiniteness**

The second paragraph of 35 U.S.C. § 112 requires that a patent claim "particularly point[]
out and distinctly claim[] the subject matter which the applicant regards as his invention."  Claim
terms that are insolubly ambiguous fail the definiteness requirement of § 112 because such terms
do not permit a person of skill in the art to understand with precision what is inside and outside
the scope of the claim.  *See Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347
(Fed. Cir. 2005).

Courts presume that different words within a claim have different meanings.  *See
Innova/Pure Water, Inc.*, 381 F.3d at 1119-20 (citing cases).  The Federal Circuit has held that
when a claim requires two different elements but the specification does not describe the
difference between those elements, the claim is invalid as indefinite.  *See PureChoice, Inc. v.
Honeywell Int'l, Inc.*, 333 Fed. Appx. 544, 549 (Fed. Cir. 2009) (unpublished).

**IV.      Argument**

**A.      "electronic money account"**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "an account for money that is only exchanged electronically" | "an electronic or digital account for money, cash, credit, currency, electronic payment system or brokerage system, including the following:  credit cards, charge cards, debit cards and/or currency or smart cards, electronic money, electronic cards, electronic cash, electronic cash cards, and/or digital cash, digital cash cards, financial accounts for banking, electronic banking, mobile banking, electronic brokerage, brokerage, checking, automated teller machine, electronic checking, savings, money market, electronic payment systems accounts, and/or other similar types of financial accounts, cellular communication accounts, and/or wireless communication accounts, as a person of ordinary skill in the art would understand" |

The term "electronic money account" is recited in each independent claim asserted by
Plaintiff, including claims 1, 9, 19, and 31 of the '270 Patent.  The dispute between the parties
centers around whether "electronic money account" refers to a specific type of account (i.e. an
account for "electronic money," such as PayPal) or whether it refers broadly to *any* account that
can be accessed electronically.  As discussed in detail below, Defendants' proposed construction

is supported by the specification of the '270 Patent and the plain, ordinary meaning of the term "electronic money account."

### 1. The specification shows that an "electronic money account" is a specific type of account

Although it does not explicitly define the term "electronic money account," the specification describes an "electronic and/or digital cash account" as including "electronic cash and/or currency accounts, digital cash accounts, alternate value media accounts and accounts and systems *for the storing, maintenance and recordkeeping of same involving cash or money in an electronic or digital form*." *See* J.A. at 55 ['270 Patent at 39:11-19] (emphasis added). Thus, the specification indicates that "accounts ... involving cash or money in an electronic or digital form" are a standalone class, distinct from other types of accounts.

Further, the specification treats "electronic money accounts" as a unique type of account—not simply any account that can be accessed electronically. For example, in the Background section, the specification first describes the benefit of checking accounts and ATM accounts. *See id.* at 36 ['270 Patent at 1:43-62]. The specification then discusses "electronic money accounts" as being separate and distinct from checking and ATM accounts: "It is envisioned that electronic money, electronic cash and/or digital accounts *are also becoming* a viable vehicle by which to conduct commerce." *Id.* ['270 Patent at 1:63-65] (emphasis added). Throughout its specification, the '270 Patent lists and treats "electronic money accounts" separately from other types of accounts. *See, e.g.*, *id.* at 36-37; 55-59; 70 ['270 Patent at 1:14-24; 2:9-19; 3:8-30; 3:53-59; 4:33-43; 39:6-47:22; 70:40-59].

The distinct nature of "electronic money accounts" is further underscored by the relationship between the '270 Patent and its three priority applications. Although the priority applications disclose various types of electronically-accessible accounts—including checking and savings accounts, credit card accounts, and debit accounts, *see*, *e.g.*, D.A. at 20 ['725 Patent at 4:2-5]—the priority applications contain no reference to an "electronic money account." The patentees, apparently recognizing that "electronic money accounts" were separate and distinct

5

from the other accounts, chose to add new matter disclosing "electronic money accounts" when they filed the application that issued as the '270 Patent. There would be no reason to add such language if "electronic money accounts" were not different from the other account types disclosed in the specification.

The '270 Patent also incorporates by reference several U.S. patents related to electronic money, electronic cash, digital money, digital cash, electronic purses, electronic wallets, and similar types of accounts.[1] *See id.* at 70 ['270 Patent at 70:12-13, 40-59]. Each of these incorporated patents, which are part of the specification of the '270 Patent, supports Defendants' proposed construction of "electronic money account" as "an account for money that is only exchanged electronically." For example, Citibank's U.S. Patent Nos. 5,453,601 (the "'601 Patent") and 5,455,407 (the "'407 Patent") each relate to "an electronic monetary system for implementing *electronic money payments as an alternative medium of economic exchange to cash, checks, credit and debit cards, and electronics funds transfer.*" *See* D.A. at 139, 248 ['601 Patent at 1:6-9; '407 Patent at 1:8-11] (emphasis added). Other incorporated patents similarly disclose that accounts having "electronic money" are distinct from accounts that can be accessed electronically. *See* D.A. at 285 [U.S. Patent No. 5,511,121 at 1:55-2:6] (teaching efficient electronic money in the form of an electronic coin); 308 [U.S. Patent No. 5,224,162 at 1:6-24] (teaching an electronic cash system through utilization of a telecommunication system or smart card and distinguishing between common electronic funds transfers and electronic cash); 347 [U.S. Patent No. 4,977,595 at 1:6-23] (same); 380 [U.S. Patent No. 5,438,184 at 1:16-37] (teaching an electronic cash system in the form of a smart card); 390 [U.S. Patent No. 5,534,683 at 1:9-34] (teaching a system for conducting transactions with a multifunctional card having an

---

[1]     Although sometimes used interchangeably, electronic money (or e-money) and digital money (or digital cash) are each distinct types of systems used in lieu of cash or currency. Digital money (or digital cash), strictly defined, refers to e-cash that is off-line, meaning that a person can conduct a transaction anonymously and without interacting with a bank. Electronic money (or e-money) that is "on-line" and "identified" is more common, an example being an electronic wallet. *See* D.A. at 589 [http://www.allbusiness.com/glossaries/electronic-cash-e/4960102-1.html].

6

electronic purse as well as the capability of a credit card); 399 [U.S. Patent No. 5,521,362 at 1:12-2:10] (teaching an electronic purse card having multiple storage memories to prevent fraud and distinguishing credit cards and debit cards from smart cards and electronic purses); 421 [U.S. Patent No. 5,221,838 at 3:46-68] (teaching an electronic wallet for storing a balance corresponding to a separate account in a financial institution); 440-41 [U.S. Patent No. 5,030,806 at 1:5-3:64] (teaching a transaction system of the electronic purse card or electronic wallet card type); 455-56 [U.S. Patent No. 4,992,646 at 1:5-3:60] (same); 467 [U.S. Patent No. 4,877,950 at 1:6-2:11] (teaching an electronic purse device and distinguishing credit cards from smart cards that hold the electronic equivalent of money).

### 2. Defendants' construction of "electronic money account" is based on the plain meaning of the term

The term "electronic money account" refers to an account for money that is only exchanged electronically (i.e., cannot be used to obtain cash). "Electronic money" is defined as "money represented, held, and used in electronic form." *See* D.A. at 470 [Dictionary.com's 21st Century Lexicon, *Definition of "electronic money*," available at http://dictionary.reference.com/browse/electronic+money]. In 2000, the U.S. Department of the Treasury produced a report entitled *A Survey of Electronic Cash, Electronic Banking, and Internet Gaming* ("Treasury Dept. Survey"), which stated:

> The terms electronic cash, e-cash, or e-money refer to electronic payment schemes that enable consumers to store and redeem financial value. They operate via *stored electronic units of value*. ... E-cash (or e-money) comes in two basic forms: smart card e-cash and computer e-cash.

*See* D.A. at 486 [Treasury Dept. Survey at 15] (emphasis added). Both forms of electronic money—smart card e-cash and computer e-cash—are only represented, held, used, and exchanged electronically. For example, a smart card consists of an integrated circuit chip embedded in a plastic card that can store a value representing smart card "e-cash," and calculate simple additions and subtractions. *Id.* Computer e-cash exists *only* electronically; it does not exist in any tangible form:

> Computer e-cash, as noted above, entails the issuance of electronic units or electronic value that can be used for payment in place of currency. Often also called e-money, computer e-cash made its appearance, primarily in the United States, in about 1995, and is used in virtual transactions over the Internet. Computer e-cash exists solely in cyberspace; in contrast with currency or smart cards, it does not exist in tangible form.

*Id.* at 490 [Treasury Dept. Survey at 19]. A well-known example of an "electronic money account" is a PayPal account. *Id.* at 491 [Treasury Dept. Survey at 20].

An "electronic money account" is fundamentally different from more traditional types of financial accounts, such as checking accounts, savings accounts, credit card accounts, or brokerage accounts. "Electronic money" only exists, and is only exchanged, in electronic form. In contrast, while money stored in checking, savings, credit card, or brokerage accounts *may* be transferred electronically, such accounts are not "electronic money accounts" because the money can be accessed in some tangible form (i.e., through an ATM). It is well understood that "electronic money accounts" are separate and distinct from checking accounts, savings accounts, credit card accounts, brokerage accounts, or other more traditional types of financial accounts. *See, e.g.*, D.A. at 583 [FDIC, *Shopping and Paying From Home Over the Internet ... Do Your Homework First*, at 2 (Summer 2001)] (noting that the common way to pay for something on the Internet is to use credit cards and check cards, but noting *other ways*, including using "'[e]lectronic cash,' also called 'digital cash,' which is a form of electronic currency that can be purchased, downloaded and stored on the hard drive of your computer or a special card."); D.A. at 585 [FTC, A Consumer's Guide to E-Payments, at 1] ("Most online shoppers use credit cards to pay for their online purchases. But debit cards—which authorize merchants to debit your bank account electronically—are increasing in use. ... Other electronic payment systems— sometimes referred to as "electronic money" or "e-money"—also are now common.").

### 3. Plaintiff's construction would render the term "electronic money" meaningless

While Defendants' proposed construction of "electronic money account" is supported by the plain meaning of the term and the specification of the '270 Patent, Plaintiff's proposed

construction is internally redundant and renders the words "electronic money" meaningless. Plaintiff argues that the term "electronic money account" means "an ... account for ... electronic money ..." *and also means* "an ... account for ... credit cards, charge cards, debit cards ...," and a laundry list of other types of accounts. Plaintiff's construction even includes wireless communication accounts which have nothing to do with "money" or "electronic money."

It is an established principle of claim construction law that every term in a claim is presumed to carry meaning. *See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000). Relatedly, a construction that renders certain claim terms meaningless—here, "electronic money"—is disfavored. *See, e.g.*, *Texas Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (rejecting proposed construction that "would render the disputed claim language mere surplusage"). Plaintiff's attempt to expand the scope of the asserted claims from "electronic money accounts" to, effectively, "accounts," should be rejected.

### 4. Plaintiff's construction is precluded under the doctrine of prosecution history estoppel

Plaintiff's proposed construction is also precluded under the doctrine of prosecution history estoppel. Plaintiff's construction expressly extends to "wireless communication accounts." When Joao originally filed the '284 Application, claim 1 was directed to an apparatus for issuing an authorization request for "one of a brokerage transaction, an electronic cash transaction and a wireless communication device transaction." J.A. at 212. During prosecution, Joao repeatedly cancelled rejected claims to overcome cited art and simply added new claims. The claims that were allowed are limited to an "electronic money account" (independent claims 1, 9, 19, 31, 45, and 47) or a "brokerage account" (independent claims 11, 18, 32, 44, 46, and 48). None of the issued claims is directed to an apparatus or method for providing security of a wireless communication account. Thus, although the original claim 1 was broad enough to encompass wireless communication accounts, Joao dropped this limitation from the claims during prosecution to overcome cited art. Allowing Plaintiff to expand the definition of

9

"electronic money account" to include a "wireless communication account" would impermissibly allow Plaintiff to claim subject matter that was surrendered during prosecution to obtain allowance.  *See generally Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002).

### B.    "one of ... and ..."

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "one of each item on a list"<br><br>For example, "one of A, B and C" means "one A, one B, and one C." | "only one item from the list."<br><br>For example, "one of A, B and C" means "only A or only B or only C." |

The phrase "one of ... and ..." is recited in every asserted claim of the '270 Patent.  A few illustrative examples of how the phrase "one of ... and ..." is used in the '270 Patent are set forth below (emphasis added):

> ... *one of* a limitation *and* a restriction ...  (claim 1)

> ... information for *one of* approving *and* disapproving the transaction ... (claim 1)

> ... *one of* a device for receiving said notification signal, a telephone, a beeper, a pager, a two-way pager, a reply pager, a home computer, a personal computer, a personal communication device, a personal communication services device, a digital communication device, a television, an interactive television, a digital television, a personal digital assistant, a display telephone, a radio, a car radio, a video telephone, a watch, a cellular telephone, a wireless telephone, a mobile telephone, a display cellular telephone, *and* a facsimile machine.  (claim 3)

> ... type of *one of* good, service, security, stock, bond, *and* derivative instrument ...  (claim 7)

### 1.    Defendants' construction is supported by the plain, ordinary meaning of the claim terms based on the correct grammatical reading

Defendants' proposed construction is supported by the plain, ordinary meaning of the words of the claims of the '270 Patent.  An authoritative treatise on grammar teaches that "an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term."  D.A. at 594 [William Strunk, Jr. & E.B.

White, *The Elements of Style* 27 (4th ed. 2000)]. Thus, "[i]n spring, summer, or winter" means "in spring, in summer, or in winter." *Id.* The claim term at issue follows this precise format. The phrase "one of" precedes a list of items, and the patentees used the term "and" to separate the items on the list, which connotes a conjunctive list.

The Federal Circuit has applied this grammatical rule and interpreted claims structured similarly to the "one of ... and" term as indicating a conjunctive list of items. For example, in *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 885-88 (Fed. Cir. 2004), the Federal Circuit construed the phrase "at least one of ... and ..." to require at least one *of each item on the list*. The Federal Circuit first noted that the plain and ordinary meaning of the claim language was based on the correct grammatical reading of the claim terms. *Id.* at 886 (citing Strunk, *The Elements of Style* 27). The Federal Circuit then noted that the specification, which disclosed embodiments that included one of each item on the list, failed to rebut the presumption that the patentee "intended the plain and ordinary meaning of this language." *Id.* at 887. Thus, the Federal Circuit held that, based on the use of the conjunctive word "and," the preposition "at least one of" modified each item in the list, and thus the claim required "at least one of" each item on the list. *Id.*; *see also Civix-DDI, LLC v. Hotels.com, LP*, 809 F. Supp. 2d 882, 900 (N.D. Ill. 2011) (construing "supplying one or more video clips and digitized images" to mean "supplying at least one video clip and at least one digital image"). Applying this principle to the '270 Patent, the phrase "one of" modifies each member of the list, and thus, the phrase "one of ... and" requires one of each item on the list. For example, "one of a limitation and a restriction" means "one of a limitation and one of a restriction."

### 2.    Defendants' construction is supported by the specification

In describing the various lists used in the claims, the specification uses the term "and/or," which describes two embodiments: (1) a conjunctive list; and (2) a disjunctive list. *See, e.g.*, J.A. at 39, 42 ['270 Patent at 8:31-46; 13:33-41] (limitation and/or restriction); 42 ['270 Patent at 13:1-17] (approving and/or disapproving)]; 4, 19, 38, 41 ['270 Patent at 5:47-65; 6:60:67; 11:65-12:8; Figs. 1, 10] (list of communication devices)]. But, although the specification teaches both

11

conjunctive and disjunctive embodiments by using the word "and/or," the claims only recite the word "and." The words of the claims, not the specification, define the invention. *See Johnson & Johnston Assocs. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (*en banc*) (holding that the claims were limited to aluminum sheets and did not include steel sheets described in the specification because the claims, not the specification, define the invention). Thus, while the specification describes both conjunctive and disjunctive embodiments, Joao, an experienced patent attorney, chose to only claim the conjunctive-list embodiment in the '270 Patent. The "one of ... and" term should be construed accordingly.

### 3. Different terms in the same or related patents are presumed to have different meanings

Plaintiff may cite to *Sleepy Hollow*, 348 F. Supp. at 123-26, where the court construed the term "at least one of ... and" in the related '725 Patent to mean "one or more of one or more of the items contained in the list." The construction of "at least one of ... and" in *Sleepy Hollow*, however, is distinguishable from this case. First, in *Sleepy Hollow*, the court construed a different term—"*at least* one of ... and"—than is at issue here. Courts presume that different words and phrases have different meanings. *See Innova/Pure Water, Inc.*, 381 F.3d at 1119-20. And, with respect to its construction of "at least one of ... and," the court especially noted that its "decision has absolutely no precedential value for any other patent." *Sleepy Hollow*, 348 F. Supp. 2d at 126.

Moreover, the court's rationale in *Sleepy Hollow* is inapplicable here. In *Sleepy Hollow*, the court first noted that the plain, ordinary meaning of the phrase required at least one of each item in the list. *Id.* at 124. The court held that the plain, ordinary meaning should not apply, however, because it noted that with respect to the asserted claims of the '725 Patent, such a construction would render the claims nonsensical. *Id.* For example, in *Sleepy Hollow*, the phrase "at least one of ... and ..." was used to list items that were mutually exclusive: "[W]herein the banking transaction is *at least one of* a clearing transaction, a check clearing transaction, an account charging transaction, *and* a charge-back transaction." *Id.* at 123 (citing '725 Patent,

12

claim 118) (emphasis in original). The court noted that a single transaction cannot be all four, so reading the claim in the correct grammatical sense did not make any sense. *Id.* at 124.

This same rationale does not apply, however, to the asserted claims of the '270 Patent. For example, the phrase "information for one of approving and disapproving the transaction" in claim 1 of the '270 Patent does not necessarily mean that the first signal approves or disapproves a transaction. Rather, the signal must contain *information for* one of approving and disapproving the transaction. A signal may contain both information for approving (i.e., sufficient balance) *and* information for disapproving (i.e., over spending limit) a transaction.

Similarly, the phrase "type of one of good, service, security, stock, bond, and derivative instrument ..." in claim 7 of the '270 Patent does not refer to a specific transaction, but refers to types of user-selected restrictions.[2] While a single transaction is typically directed to a single type (i.e., a good or a service or a security), a user-selected restriction—which is determined before a transaction is processed—can involve multiple types. In other words, a restriction may relate to a good, a service, a security, a stock, a bond, *and* a derivative instrument.

### C.    "one of a limitation and a restriction"

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| Indefinite. | "only a limitation as defined herein or only a restriction as defined herein" <br><br> A limitation or a restriction is defined as follows: "something that limits or restricts, or something that restrains, or something that bounds or restrains or confines within bounds, or a restraining or confining or bounding rule or condition, or a restraint" |

The phrase "one of a limitation and a restriction" is recited in independent claims 1 and 9 of the '270 Patent. The phrase is insolubly ambiguous because there is a presumption that "limitation" and "restriction" mean different things, but a person of skill in the art would not be able to determine what constitutes a limitation versus what constitutes a restriction.[3]

---

[2]    As discussed below, Defendants submit that the term "one of a limitation and a restriction" is indefinite. Defendants refer to only a "restriction" here for convenience alone.

[3]    The term "one of a limitation and a restriction" is indefinite irrespective of whether the

"In the absence of any evidence to the contrary, [courts] must presume that the use of ... different terms in the claims connotes different meanings." *See CAE Screenplates*, 224 F.3d at 1317. Thus, the word "limitation" is presumed to have a different meaning than the word "restriction." But neither the claims nor the specification of the '270 Patent distinguish the meaning of a "limitation" from the meaning of a "restriction." For example, dependent claim 7 recites "[t]he apparatus of claim 1, wherein said one of a limitation and a restriction is ...," and then lists a laundry list of possible categories, such as the type of transaction, the person and/or entity authorized to conduct the transaction, the transaction amount limit, the account daily spending limit, etc. *See* J.A. at 71. In other words, claim 7 uses the terms "limitation" and "restriction" interchangeably, and apparently provides that a "transaction account limit" can be a "restriction." Further, throughout its specification, the '270 Patent does not distinguish between a "limitation" and a "restriction," but consistently uses the terms together, i.e., "limitation and/or restriction." *See, e.g.*, J.A. at 39; 42 ['270 Patent at 8:31-46; 13:33-41].

Even Plaintiff's own proposed construction treats the terms "limitation" and "restriction" as having the same meaning. Plaintiff proposes that the term "one of a limitation and a restriction" be defined as "only a limitation as defined herein or only a restriction as defined herein." But, Plaintiff then proposes a single definition for "a limitation or a restriction." If the patentees cannot articulate the meaning of their own claim terms, a person of ordinary skill in the art would not be able to do so either.

### D. "processor"

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "that part of a computer containing the circuits required to interpret and execute instructions" | "a device which performs an operation, an action, or a function, on, with, or regarding, data or information, or a device which performs a number of operations, actions, or functions, on, with, or regarding, data or information, or a device which performs an operation, an action, or a function, or a device which performs a number of operations, actions, or functions" |

Court adopts Defendants' or Plaintiff's construction of the term "one of ... and ...," discussed above. Under either construction, a person of ordinary skill in the art would need to determine the difference in claim scope between a "limitation" and a "restriction."

14

The term "processor" is recited in asserted claims 1, 19, 26, and 51 of the '270 Patent. The following portion of claim 1 (emphasis added) is representative:

> ... a **processor** for processing a transaction on the electronic money account in conjunction with said one of a limitation and a restriction,
>
> wherein said **processor** generates a first signal, and further wherein said first signal contains information for one of approving and disapproving the transaction.

The term "processor" is not disclosed in the specification of the '270 Patent, except in the claims and the Abstract, which merely mimics the language in the claims. A person of skill in the art would understand that the term "processor" is "that part of a computer containing the circuits required to interpret and execute instructions." For example, the McGraw-Hill Dictionary of Scientific and Technological Terms defines "processor" as "a device that performs one or many functions, usually a central processing unit," and defines "central processing unit" as "[t]he part of a computer containing the circuits required to interpret and execute the instructions." *See* D.A. at 598, 600 [McGraw-Hill Dictionary of Scientific and Technological Terms, 356, 1676 (6th ed. 2003)]. Defendants' proposed construction is based on this plain, ordinary meaning.

Plaintiff's proposed disjunctive construction, on the other hand, is confusing, ambiguous, and arbitrary. As such, Plaintiff's construction injects unnecessary ambiguity and confusion into the term and would hinder a jury from understanding what a "processor" is. Plaintiff's construction must be rejected.

### E.   "processing" / "processes"

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "assembling, compiling, generating, interpreting, computing and otherwise acting on information in a computer"<br><br>"assembles, compiles, generates, interprets, computes and otherwise acts on information in a computer" | "performing an operation, an action, or a function, on, with, or regarding, data or information, or performing a number of operations, actions, or functions, on, with, or regarding, data or information, or performing an operation, an action, or a function, or performing a number of operations, actions, or functions" |

The terms "processing" and "processes" are recited in asserted claims 1, 9, 19, 26, 31, 51, 83, and/or 85 of the '270 patent. The following portion of claim 1 (emphasis added) is representative:

> ... a processor for **processing** a transaction on the electronic money account in conjunction with said one of a limitation and a restriction …

A person of ordinary skill in the art would understand that the term "processing" means "assembling, compiling, generating, interpreting, computing and otherwise acting on information in a computer," and that the term "processes" means "assembles, compiles, generates, interprets, computes and otherwise acts on information in a computer." For example, the McGraw-Hill Dictionary of Scientific and Technological Terms defines "process" as "to assemble, compile, generate, interpret, compute, and otherwise act on information in a computer." *See* D.A. at 600 [McGraw-Hill Dictionary of Scientific and Technological Terms, 1676 (6th ed. 2003)].

The term "processing" is repeatedly and consistently used in conjunction with a "central processing computer." *See, e.g.*, J.A. at 37; 40; 43; 45; 55; 57 ['270 Patent at 4:59-64; 9:39-45; 15:13-19; 19:20-25; 39:48-56; 43:44-52]. Thus, Defendants' construction that "processing" or "processes" means "assemble, compile, generate, interpret, compute, and otherwise act on information in a computer" is consistent with the plain meaning of the words of the claims and the specification of the '270 Patent.

Plaintiff's proposed disjunctive construction, on the other hand, is confusing, ambiguous, and arbitrary. As such, Plaintiff's construction injects unnecessary ambiguity and confusion into the term and would hinder a jury from understanding what "processing" and "processes" means.

**F.      "An [apparatus / method] for providing account security"**

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| The preamble is not a limitation. Alternatively:<br><br>"An apparatus for providing safety or protection from risk of an account"<br><br>"A method for providing safety or protection from risk of an account" | "A computerized system or a computer-implemented method or process for providing protection against an unauthorized use of an account once one has been provided with the ability, whether authorized or not authorized, to perform a transaction on or involving the account, or for providing protection against an unauthorized use of an account once one has gained access |

16

| Defendants' Construction | Plaintiff's Construction |
|---|---|
|  | sufficient to allow one the ability, whether authorized or not authorized, to perform a transaction on or involving the account" |

The terms "[a]n apparatus for providing account security" and "[a] method for providing account security" appear in the preambles of asserted independent claims 1, 9, 19, and 31 of the '270 Patent. The parties dispute: (1) whether the preamble is limiting, and, if so, (2) how the preamble should be construed.

The preamble is not a limitation because it merely states the purpose or intended use of the invention. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006). For example, the overall purpose of the alleged invention in the '270 Patent is to provide safety or protection from risk of an account by preventing "theft and/or fraud." *See* J.A. at 36 ['270 Patent at 2:9-24]. Further, the preamble does not recite any essential structure that is necessary to give meaning to the claims. *See Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[A] preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim.") (citation omitted).

Should the Court decide that the preamble is a limitation, the Court should construe "account security" to mean "safety or protection from risk of an account." A person of ordinary skill in the art would understand that the phrase "providing account security" means "providing safety or protection from risk of an account." For example, Webster's New Universal Unabridged Dictionary defines "security" as "freedom from danger, risk, etc.; safety." *See* D.A. at 604 [Webster's New Universal Unabridged Dictionary, 1731 (2nd ed. 2003)].

In *Sleepy Hollow*, Plaintiff agreed to define the term "security" in the related '725 Patent to mean "providing safety or protection from risk," which is identical to Defendants' current proposed construction for this term. *See* D.A. at 608 [*Joao v. Sleepy Hollow Bank*, No. 03-cv-10199, Joint Markman Claim Construction Statement at 1, ECF No.34 (S.D.N.Y. Oct. 29, 2004).] Because the '270 Patent is related to the '725 Patent at issue in *Sleepy Hollow* and shares a similar specification, common claim terms should be construed to have the same

17

meaning in both patents. *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1348 (Fed. Cir. 2007) (citing *Omega Eng'g, Inc., v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.")).  Plaintiff now offers a construction for "security" that is entirely inconsistent with the construction it agreed to in *Sleepy Hollow*.  But, Plaintiff's proposed disjunctive construction is confusing, ambiguous, and arbitrary.  As such, Plaintiff's construction injects unnecessary ambiguity and confusion into the terms and would hinder a jury from understanding what an "[apparatus / method] for providing account security" means.

### G. "transaction"

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| "increasing or decreasing the balance of an electronic money account" | "an act, an activity, an action, or a process, or an act, an activity, an action, or a process, which is being carried out or performed or which has been carried out or performed" |

The term "transaction" appears in asserted claims 1, 7, 9, 19, 24, 26, 31, 51, 57, 67, 73, 83, and 85 of the '270 Patent.  The following portion of claim 1 (emphasis added) is representative:

> ... a processor for processing a **transaction** on the electronic money account in conjunction with said one of a limitation and a restriction,
>
> wherein said processor generates a first signal, and further wherein said first signal contains information for one of approving and disapproving the **transaction**.

Throughout the claims, the term "transaction" is directly coupled to operations affecting an account.  For example: "processing a transaction on the electronic money account in conjunction with said one of a limitation and a restriction," *see* J.A. at 71 (claim 1); "information corresponding to a transaction occurring on an electronic money account," *id.* at 72 (claim 19); and "a financial institution authorized to perform a transaction on the account."  *Id.* (claim 26).

Similar to the claims, the specification of the '270 Patent fully supports Defendants' proposed construction.  Throughout the specification, "transaction" signifies operations performed on accounts to increase or decrease the balance.  *See, e.g.,* J.A. at 36; 72 ['270 Patent

at 1:32-35 ("By utilizing credit cards charge cards, debit cards, and/or currency or 'smart' cards, an individual may enter into a transaction without having to have cash or currency in hand or otherwise."); 1:50-56 (referring to "checks and/or other transaction instruments," which enable individuals to "draw against their money without having to undergo the inconvenience of going to the bank or other financial institution"); 74:24 (reciting "transaction amount"); 74:38-39 (reciting "transaction amount limit")]. In fact the goal of the '270 Patent is described as protection against "unauthorized transactions" on one's accounts, which could cost an exemplary user "upwards of thousands of dollars." *Id.* at 36 ['270 Patent at 2:26; *see generally* 2:10-59]. The patent seeks to protect individuals from unauthorized increases of their credit card balances or decreases of their checking or other account balances.

In addition, the understanding of a "transaction" as a change in the balance or value of an account is the longstanding understanding within the field. In *Sleepy Hollow*, the Court construed "banking transaction" as "[a]n activity affecting a deposit account, such as a deposit of funds or a withdrawal." 348 F. Supp. at 130 (using a shortened version of the definition found in *Barrons' Business Guide, Dictionary of Banking Terms* (4th ed. 2000)).

Plaintiff's construction offers no boundaries and will be confusing to a jury. It offers no guidance as to scope, which is the primary function of the claims. *See Phillips*, 415 F.3d at 1312. Plaintiff's construction fails to meaningfully describe what constitutes a transaction. "Act," "activity," "action," and "process" are general terms. "Act" is not descriptive; it merely notes that something was done without saying *what* was done. The rest of Plaintiff's proposed construction is similarly uninformative, as "which is being carried out or performed or which has been carried out or performed" only tells us that something happened, without information as to *what* the activity is or was.

Plaintiff's construction will also be confusing to a jury because it encompasses, and could be confused with, the computer science use of "transaction" as a general term for communications or messaging. This concept is entirely absent from the '270 Patent. Plaintiff's definition would exploit this alternate understanding, but is inconsistent with the patent. The

19

'270 Patent system might be implemented on a computer, but the asserted claims relate to security of electronic money accounts. *See*, *e.g.*, J.A. at 37 ['270 patent at 4:33-41 (stating, in the first sentence of the Summary of the Invention, that "[t]he present invention provides an apparatus and a method for providing *financial transaction* authorization, notification and/or security" and listing several types of bank and financial accounts that the invention could be applied to, including an electronic money account) (emphasis added)]. Thus, a definition based solely on computer science principles is not pertinent to the asserted claims of the '270 Patent.

### H. "receiver"

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "a device of a banking or financial institution for receiving signals or data from an outside source and converting those signals or data to usable form" | "a networking interface or a device for receiving a signal, data, information, or a message, or a device for the reception of a signal, data, information, or a message" |

The claim term "receiver" is recited in independent claim 1 of the '270 Patent. The pertinent portion of that claim (emphasis added) is as follows:

> ... a **receiver** for receiving one of a limitation and a restriction on usage of an electronic money account, wherein said one of a limitation and a restriction are received from an account holder ...

The parties dispute whether the receiver must be at a bank or financial institution, and whether the receiver must receive signals or data from an outside source. Defendants' proposed construction embodies the ordinary meaning, and clarifies the term by describing its functional position in the claimed invention. The receiver of claim 1 must be a physical device at a banking or financial institution capable of receiving incoming signals or data from an account holder. Unless account holders are also running the banking or financial institution in question, logic dictates that they send a signal or data from outside that institution. Thus, Defendants' construction assists the trier of fact by eliminating ambiguities regarding the position and function of receivers in the claimed invention.

The specification fully supports Defendants' proposed construction: "The central processing computer 103 also comprises a receiver(s) 103G for receiving signals and/or data

from the banking transaction device 102 and from the communication device 104 and/or from 5 any other suitable device which may be utilized in conjunction with the apparatus 100." J.A. at 48 ['270 Patent at 26:1-6]. In fact, the specification refers to a "receiver" that is for "receiving signals and/or data" from outside sources at least 15 times in various contexts. The specification also refers to the operators of such receivers: "In instances when the communication device does not have a reply or two-way pager feature, the account owner may simply telephone the central processing office or processing center and/or the banking or financial institution." *Id.* at 50 ['270 Patent at 29:6-9].

Also, because the '270 Patent is related to the '725 Patent at issue in *Sleepy Hollow* and shares a similar specification, common claim terms should be construed to have the same meaning in both patents. *See z4 Techs., Inc.*, 507 F.3d at 1348 (citing *Omega Eng'g, Inc.*, 334 at 1334). In *Sleepy Hollow*, the Court construed the term "receiver" to mean "a device for receiving signals or data from an outside source and converting those signals or data to usable form." 348 F. Supp. 2d at 126. Therefore, Defendants' proposed construction of "receiver" is consistent with the Court's "outside source" construction in *Sleepy Hollow*.

Plaintiff's proposed construction, on the other hand, is ambiguous and arbitrary. First, it is not clear what the term "network interface or device" would even mean. This term is not mentioned in the specification or the prosecution history of the '270 Patent, nor does it have any ordinary meaning. As such, Plaintiff's construction injects unnecessary ambiguity into the term and would hinder a jury from understanding what a "receiver" is. Second, it is not clear from Plaintiff's construction what the position or function of a "receiver" could be. The construction not only broadens the meaning of the term beyond the disclosure, but it also divorces it from the larger system. Third, Plaintiff's construction is redundant and likely indefinite. The construction is disjunctive, equating "receiver" to either a "[n]etworking interface or a device for receiving …" or "a device for the reception of …." Under this construction, a "receiver" could be "a device for receiving" or "a device for the reception of." This redundancy renders mere

21

surplusage one clause or the other and would confuse the issue as well as the jury. Plaintiff's construction must be rejected.

### I. "communication device"

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "a device, including a receiver and a transmitter, for the transmission of intelligence between two or more points" | "a device which transmits a signal, data, information, or a message, or a device which receives a signal, data, information, or a message, or a device which can transmit a signal, data, information, or a message and which can receive a signal, data, information, or a message" |

The term "communication device" is recited in asserted claims 3, 19, 31, 51, 83, and 85 of the '270 Patent. The following portion of claim 19 (emphasis added) is representative:

> ... a transmitter for transmitting said second signal one of to the account holder and to a **communication device** associated with the account holder, wherein said second signal provides notification of the transaction.

The parties' primary dispute is whether a "communication device" must include both a transmitter and a receiver or, alternatively, may include either. This same dispute, however, was already resolved in *Sleepy Hollow*. There, the court rejected Plaintiff's proposed construction and construed the term to mean "[a]n apparatus for the transmission of intelligence between two or more points," which is consistent with Defendants' proposed construction.[4] *See Sleepy Hollow*, 348 F. Supp. 2d at 126-27.

In *Sleepy Hollow*, Plaintiff proposed that "communication device" in the related '725 Patent should be defined as "[a] device having a receiver and a transmitter, or a device having a receiver, or a device having a transmitter," which is very similar to Plaintiff's proposed construction of "communication device" in the '270 Patent. *Id.* The court ruled that Plaintiff's disjunctive construction could not possibly be correct because it included a definition where "communication device" could be a device having a receiver, but not having a transmitter. *Id.* For analogous reasons, Plaintiff's current proposed disjunctive construction of "communication device" is wrong—a communication device must be able to both receive and send data.

---

[4]     Defendants are willing to replace "intelligence" with "data" for clarity.

Plaintiff's construction will also be confusing to a jury because of its disjunctive nature of a "communication device" being defined as one of three different embodiments.

In the pertinent asserted claims, the recited "communication device" must both receive and send data. For example: "a transmitter for transmitting a notification signal *to a communication device*." *See* J.A. at 71-74; 77 ['270 Patent at claims 3, 19, 31, 51, 83 and 85)] (emphasis added). Plaintiff's disjunctive definition would encompass devices that are unable to receive data. In addition, to "communicate," a "communication device" must communicate or *transmit* data. "Communicate" comes from the Latin word "communicare," which means "to impart." *See Sleepy Hollow*, 348 F. Supp. at 127. In the common parlance, "communicate" is defined as "[t]o convey knowledge of or information about, to make known." *Id.* (citing Webster's New Collegiate Dictionary, 228 (1977 ed.)); *see also* D.A. at 603 [Webster's New Universal Unabridged Dictionary, 414 (2nd ed. 2003)]. In the technical parlance, "communication" means "[t]he transmission of intelligence between two or more points ...." *Sleepy Hollow*, 348 F. Supp. at 127*; see also* D.A. at 599 [McGraw-Hill Dictionary of Scientific and Technological Terms, 440 (6th ed. 2003)]. The plain meaning of "communication" requires the transmission of data. Plaintiff's disjunctive definition would encompass devices that are unable to transmit data.

The specification of the '270 Patent also supports construing "communication device" to include a receiver and a transmitter. For example, Figures 2, 5, 8, 11, 14, and 17 of the '270 Patent illustrate that the communication device includes both a receiver 4G, 104G, 204G, 304G, 404G, and 504G and a transmitter 4H, 104H, 204H, 304H, 404H, and 504H. *See* J.A. at 5, 10, 15, 20, 25, and 30. Figures. 1, 4, 7, 10, 13, 16, 19, and 20 illustrate that data is both sent and received from communication device 4, 104, 204, 304, 404, 504, 604, and 704. *Id.* at 4, 9, 14, 19, 24, 29, 34 and 35. The specification teaches that a "communication device" "comprises a receiver 304G for receiving signals and/or data from the central processing computer 303 and which is also connected to the CPU 304A, and a transmitter 304H for transmitting signals and/or data to the central processing computer 303 and which is also connected to the CPU 304A." J.A.

at 56 ['270 Patent at 42:65-43:4].

In sum, Defendants' proposed construction is supported by the plain, ordinary meaning of the words of the claims and specification of the '270 Patent.

### J. "notification signal"

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "a separate series of electronic pulses sent to an account holder containing data reporting the occurrence of a transaction on an electronic money account" | "a separate message that provides information which reports an occurrence of a transaction on or involving an account, or a message which serves to alert one to an occurrence of a transaction on or involving an account" |

The term "notification signal" appears in dependent claim 3 of the '270 Patent, which recites: "[t]he apparatus of claim 1, further comprising ... a transmitter for transmitting a *notification signal* to a communication device associated with the account holder ...." J.A. at 71 ['270 Patent at claim 3 (emphasis added)]. The parties' dispute with respect to the construction of this term appears to be centered on three issues. First, the parties dispute whether the "notification signal" must be communicated to the account holder. Second, the parties dispute whether the transaction that is reported is limited to an "electronic money account." Third, the parties dispute whether "signal" refers to a "message" or a series of electronic pulses.

The plain language of the claim supports Defendants' construction requiring the signal to be transmitted to an "account holder." For example, the fact that the claim requires that the "notification signal" be sent to an account holder's "communication device," such as a cellular telephone or personal digital assistant, makes clear that the notification must occur outside of the claimed system. The specification likewise supports Defendants' proposed construction of "notification signal" as limited to a signal to an account holder. *See, e.g.,* J.A. at 36-38; 40 ['270 Patent at 2:63-64; 3:12-13 (problem solved by the patent is account transactions "without the account owner's notification and/or knowledge"); 4:24-26; 3:47-50 (in typical account setup, "account owner would not receive notification and/or have knowledge of the unauthorized transaction until they are notified by the bank or financial institution either via a monthly and/or

24

periodic statement"); 5:66-6:1; 9:17-27; 10:7-24 (describing embodiments of invention in which an "account holder can be notified of a transaction and/or an attempted transaction"); 9:55-62].

In addition, Defendants' construction that the "notification signal" report a transaction on an *electronic money* account (as opposed to a generic "account") is in accord with the claim language. Claim 3 depends from claim 1, which refers to only one type of account; namely, an "electronic money account."

The claims also support Defendants' construction of "signal" as meaning a series of electronic pulses. The word "signal" is recited in independent claims 1, 9, 19, and 31 of the '270 Patent. While the "*notification* signal" of dependent claim 3 may relate to a "message," the patent uses "signal" in other claims in relation to electronic pulses. *See, e.g.*, J.A. at 71-72 ['270 Patent at claim 1 ("said processor generates a first signal"); claim 19 ("a processor for processing a first signal"]. This use is consistent with the plain meaning of the word "signal" as used in computing applications. *See, e.g.*, D.A. at 771; 776 [Newton's Telecom Dictionary, 799 (16th ed. 2000)]; [Oxford Dictionary of Computing, 451 (4th ed. 1997)].

Plaintiff's proposed construction for this term serves to broaden the claim scope beyond that warranted by the plain language of the claims and the specification, and introduces excess verbiage that does little to inform the fact-finder regarding the meaning of the claim term. First, by failing to specify that the notification signal provides notice of a transaction to the account holder, Plaintiff's construction incorrectly leaves open the possibility that the "notification signal" could be internal to the system, or could be a message to a financial institution rather than the underlying account holder. Second, Plaintiff's construction incorrectly leaves open the possibility that the notification signal reports the occurrence of an account that is not an "electronic money account." Third, Plaintiff's construction incorrectly leaves open the possibility that the "signal" may be a "message" that is not electronic.

## V.     Conclusion

For the foregoing reasons, Defendants respectfully request the Court adopt the Defendants' proposed constructions of the disputed terms above.

## **L.P.R. 4-1 CERTIFICATION**

Pursuant to L.P.R. 4-1(b), Defendants certify that the following disputed terms are outcome determinative with respect to at least one or more asserted claims, and with respect to one or more of Plaintiff's infringement contentions and/or one or more of Defendants' invalidity contentions: (1) "electronic money account"; (2) "one of ... and ..."; (3) "one of a limitation and a restriction"; (4) "processor"; (5) "processing" / "processes"; (6) "account security"; and (7)"transaction." The parties were unable to reach an agreement on the terms to present to the Court for construction. Thus, pursuant to L.P.R. 4-1(b), Plaintiff chose to request construction of the following terms: (8) "receiver"; (9) "communication device"; and (10) "notification signal."

Dated: October 18, 2012         Respectfully submitted,


By:   */s/ Michael J. Song*        .

        Michael J. Song (admitted *pro hac vice*)
        PERKINS COIE, LLP
        1888 Century Park East, Suite 1700
        Los Angeles, CA 90067-1721
        Tel:  310-788-9900
        Fax:  310-788-3399
        Email:  Msong@perkinscoie.com

        Christina J. McCullough (admitted *pro hac vice*)
        PERKINS COIE, LLP
        1201 Third Ave., Suite 4900
        Seattle, WA 98101-3099
        Tel:  206-359-8000
        Fax:  206-359-9000
        Email:  CMcCullough@perkinscoie.com

        Attorneys for Defendants
        INLAND BANK & TRUST, THE NATIONAL
        BANK, and FIRST NATIONAL BANK AND
        TRUST COMPANY


By:   */s/ Michael J. Sacksteder*      .

        Michael J. Sacksteder (admitted *pro hac vice*)
        David D. Schumann (admitted *pro hac vice*)
        FENWICK & WEST LLP
        555 California Street, 12th Floor
        San Francisco, CA 94104
        Tel:  415-875-2300
        Fax:  415-281-1350
        Email:  msacksteder@fenwick.com
        Email:  dschumann@fenwick.com

        Attorneys for Defendant
        FIRST AMERICAN BANK

By:  */s/  John P. Murphy                 .*

Edward K. Runyan
BAKER & MCKENZIE LLP
130 East Randolph Street, Suite 3900
Chicago, IL 60601
Tel:  312-861-8811
Fax:  312-861-2899
Email: Edward.Runyan@bakermckenzie.com

John P. Murphy (admitted *pro hac vice*)
BAKER & MCKENZIE LLP
2001 Ross Ave., Ste. 2300
Dallas, TX 75201
Tel:  214-978-3053
Fax:  214-965-5976
Email:  john.p.murphy@bakermckenzie.com

Attorneys for Defendants

AMERICAN CHARTERED BANK,
BRIDGEVIEW BANK GROUP,
BARRINGTON BANK & TRUST
COMPANY N.A., HINSDALE BANK &
TRUST COMPANY, LAKE FOREST BANK
AND TRUST COMPANY, LIBERTYVILLE
BANK & TRUST COMPANY, NORTH
SHORE COMMUNITY BANK & TRUST
COMPANY, and NORTHBROOK BANK
AND TRUST COMPANY

**CERTIFICATE OF SERVICE**

I, Michael J. Song, hereby certify that on October 18, 2012, I caused to be served

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF with the Clerk of the Court

using the CM/ECF system, which will send an electronic copy of the foregoing to counsel of

record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to

Local Rule 5.9 of the U.S. District Court for the Northern District of Illinois.


　　　　　 */s/  Michael J. Song*　　　　　
　　　　　 Michael J. Song